# EXHIBIT D

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

Bosch Automotive Service Solutions Inc.,

    Claimant,

v.

Case No. 01-21-0016-2306

Collision Sciences Inc.,

    Respondent.
_____/

## FINAL AWARD

I, Thomas W. Cranmer, having been designated to serve as an arbitrator in this matter pursuant to the arbitration agreement between the parties contained in the End User License Agreement dated May 30, 2019, and having been duly sworn and heard the proofs and allegations of the parties, hereby make these findings as my Final Award.

**Factual and Procedural Background**

Claimant Bosch Automotive Service Solutions Inc. ("Bosch") initiated this proceeding against Respondent Collision Sciences Inc. ("CSI") by filing a Demand for Arbitration on August 20, 2021 asserting a single cause of action for breach of contract. Bosch claims that CSI violated the terms of an End User License Agreement ("EULA") governing the use of Bosch's Crash Data Retrieval Tool Software ("CDR Software") which, when physically connected to a motor vehicle, retrieves and displays technical information logged by that vehicle's event data recorder relating to any collision in which the vehicle has been involved. Specifically, Bosch contends that CSI breached the EULA by using the CDR Software to design and sell its own CrashScan application, a product that retrieves and displays vehicle collision information wirelessly.

Multiple versions of the EULA were in effect during the time period that CSI purchased a license for the CDR Software from Bosch. However, by order dated August 12, 2024, I limited Bosch's claims of breach to the following:

1. The derivative works provisions contained in ¶ 1.3 of the EULA dated April 11, 2017 (the "2017 EULA") and ¶ 2.3.5 of the EULA dated May 31, 2019 (the "2019 EULA");

2. The competition provision contained in ¶ 2.3.7 of the 2019 EULA;

3. The remote connection provision contained in ¶ 2.2.1 of the 2019 EULA; and

4. The reverse engineering provision contained in ¶ 2.3.1 of the 2019 EULA.

A final evidentiary hearing was held on these claims on September 9 and 10, 2024 at the offices of Miller, Canfield, Paddock & Stone, PLC in Detroit, Michigan. Both sides presented multiple witnesses and exhibits. At the conclusion of the hearing, I set a deadline of November 8, 2024 for the submission of initial post-hearing briefs and December 6, 2024 for any responses. Both sides filed opening and response briefs in accordance with these deadlines.

After hearing the evidence presented on both sides and considering all of the arguments and positions of the parties, I now find as follows:

1. CSI has breached the competition (¶ 2.3.7) and remote connection (¶ 2.2.1) provisions of the 2019 EULA;

2. Bosch is entitled to monetary damages in the amount of $111,501.80 reflecting the cost that it incurred in conducting a software audit; and

3. CSI shall be subject to a permanent injunction as described in more detail herein.

## Legal Analysis

A. <u>Claims of Breach</u>

In order to assess Bosch's claims of breach, each of the operative provisions of the 2017 and 2019 EULAs must be examined in turn.

2

*1. Derivate Works Provisions*

The 2017 EULA provides that Bosch "reserves all rights for the Licensed Software, in particular exclusive right to reproduce, to distribute, to prepare derivate works therefrom and to publicly display Licensed Software." 2017 EULA, ¶ 1.3. The term "derivative works" is undefined in that agreement, which was unilaterally drafted by Bosch. However, Bosch offered further guidance on the intended meaning of the term in the 2019 EULA. That agreement provides that CSI will not "[m]odify in any way or prepare derivative works *of the source or object code of the Software*." 2019 EULA, ¶ 2.3.5 (emphasis added). Accordingly, I find that in order to constitute a "derivative work" within the meaning of these agreements, CSI's CrashScan application must have been developed from the actual coding of the CDR Software.

The evidence presented at the final hearing made clear that this was not the case. Specifically, Bosch's own software expert, Joshua HelfinSiegel, admitted that he "did not find any indicia of copying of the [Bosch] source code." Hearing Tr., Vol. 2, at 171. Moreover, while Bosch argues in its briefing that a piece of software is considered a derivative work when it is "built to run with an already existing software program, and especially when it cannot function without that underlying program" (Cl.'s Post-Hearing Br., at 25), that is not the case here. Again, Bosch's own expert testified that the CrashScan application "can run without Bosch's software." Hearing Tr., Vol. 2, at 176. Accordingly, I find no violation of the derivative works provisions of the 2017 EULA or the 2019 EULA.

*2. Competition Provision*

The 2019 EULA prohibits CSI from "us[ing] or permit[ting] any other person to use the Software in any way that competes with Bosch's products or services." 2019 EULA, ¶ 2.3.7. The evidence presented at the hearing conclusively demonstrated that CSI repeatedly used the CDR

3

Software to retrieve and interpret EDR data to generate a "second opinion" for the purpose of verifying and refining the accuracy and effectiveness of its own product. *See* Hearing Tr., Vol. 2, at 208, 219. Indeed, CSI has admitted to this conduct. Nevertheless, CSI contends that its use of the CDR Software does not constitute competition within the meaning of the 2019 EULA because the two products target different customers (i.e. Bosch caters primarily to insurance companies while CSI caters primarily to members of law enforcement and accident reconstructions), maintain different price points (i.e. Bosch's product is more expensive than CSI's), and utilize different mechanics (i.e. Bosch requires a direct connection to the vehicle while CSI's product is wireless).

While there are undeniable differences between Bosch's CDR Software and CSI's CrashScan application, these differences do not overcome the predicate fact that CSI itself developed its EDR product to achieve the same functionality as the product that Bosch was already selling. Indeed Jason Bayley, CSI's Chief Executive Officer, acknowledged at the hearing that the CrashScan application was developed and marketed "as a direct replacement for the Bosch tool." Hearing Tr., Vol. 2, at 245. Moreover, the evidence showed that CSI repeatedly provided reports generated through the CDR Software to prospective customers, including insurance companies, in order to encourage those customers to compare the companies' two products, and it even emphasized Bosch and CSI's similar "capabil[ities]" in retrieving and interpreting EDR data. Hearing Exh. 179. While it is true that Bosch has failed to identify a single customer that it has lost as a result of any of these practices, the ultimate success of CSI's competitive efforts is a question of damages. It does not speak to the preliminary question of whether a breach of the license has occurred. The 2019 EULA plainly prohibits CSI from using the CDR Software "in any way" to compete. 2019 EULA, ¶ 2.3.7. CSI has violated that prohibition by the admission of its own agents.

43189542.1/003229.00283

*3. Remote Transmission Provision*

The 2019 EULA provides that, "Connections to vehicles and/or electronic control units (ECU) for the purposes of retrieving data must be done by directly connect[ing] the CDR tool to the vehicle using CDR tool cables and/or adaptors approved by Bosch. Any connections to a vehicle or ECU through additional hardware and software which is not part of the CDR tool is prohibited including, but not limited to, indirectly connecting the CDR tool through a wireless OBDII communications device, enabling remote connection to CDR tools over a server or internet server." 2019 EULA, ¶ 2.2.1. CSI contends that it has not violated this provision because it does not use any Bosch product "for the purposes of retrieving data" within the meaning of the first sentence. Specifically, CSI explains: "Instead, CSI's CrashScan application and Amazon web server retrieve the data, and if a second opinion is ever needed the CDR Replay tool then submits the data directly into Bosch. In such situations, the Bosch tool is directly connected to the CDR Replay tool, which is connected to a bunch of cables arranged to simulate a vehicle network." Resp.'s Post-Hearing Br., at 12 (internal citations omitted).

The problem with CSI's position is that the second sentence of the operative contractual provision is not similarly limited by the phrase "for the purposes of retrieving data." Instead, it broadly prohibits "[a]ny connections to a vehicle or ECU through additional hardware and software which is not part of the CDR tool." 2019 EULA, ¶ 2.2.1. Accordingly, CSI's explanation as to why it has not violated the first sentence of the provision squarely establishes why it did violate the second: it used "additional" software – its CrashScan application – to remotely connect to vehicles and then, when a "second opinion" was needed, it used the Bosch tool to further interpret and validate the data that it extracted. Put another way, CSI combined its own wireless

5

tools with those that it licensed from Bosch in order to generate and refine crash information and improve upon its own product. This violated the remote transmission provision of the 2019 EULA.

4. *Reverse Engineering Provision*

Finally, the 2019 EULA provides that CSI shall not "alter, copy, disassemble, decompile, reverse engineer, decode or otherwise attempt to access or derive the source code or architectural framework of the Software." 2019 EULA, ¶ 2.3.1. As a matter of contractual interpretation, the parties disagree whether the phrase "the source code or architectural framework" modifies the prohibition against reverse engineering. Specifically, Bosch contends that it was not intended to limit the type of reverse engineering that was forbidden: any effort to learn how the CDR Software worked, and not simply efforts to copy the source code or architectural framework, was impermissible. I respectfully disagree. The phrase "source code or architectural framework" is preceded by the word "otherwise," which is commonly used to convey "explanations of the same thing in different words." *Bowles v. Weiner*, 6 F.R.D. 540, 542 (E.D. Mich. 1947). Accordingly, I find that all of the actions which precedes the word "otherwise" ( i.e. "alter, copy, disassemble, decompile, reverse engineer, decode") are prohibited methods of "access[ing] or deriv[ing] the source code or architectural framework" of the CDR Software. This interpretation is fatal to Bosch's claim for breach of the reverse engineering provision because, as stated above, Bosch's own expert admitted that he "did not find any indicia of copying of the [Bosch] source code." Hearing Tr., Vol. 2, at 171.

B. <u>Damages</u>

Bosch has conceded that it has failed to offer any evidence at trial to justify the award of lost profits. Instead, the bulk of its damage claim relates to the audit provision of the 2019 EULA. It provides as follows: "If [Bosch] discovers unauthorized use, reproduction, distribution, or other

6

exploitation of the Software, [CSI] shall reimburse Bosch for the reasonable cost of the audit." 2019 EULA, ¶ 10.1. As an initial matter, I note that the scope of this fee-shifting provision is not permissive; if an audit reveals any misuse of the CDR Software, the award of the reasonable cost of that audit is mandatory. Such misuse has been proven here. While Bosch's audit may not have uncovered evidence of reverse engineering or derivative use, Mr. HelfinSiegel's report and accompanying testimony nevertheless lays out numerous pieces of technical information supporting CSI's violation of the competition and remote transmission provisions of the EULA. *See, e.g.,* Hearing Tr., Vol. 1, 159-160. Accordingly, CSI is responsible for the reasonable cost of the software audit that he conducted.

The only objection levied by CSI to the cost of that audit is that Mr. HelifinSiegel participated in too many calls with Bosch's counsel during the course of his work. However, given the highly complex nature of the software dispute in this case, I find that it was not unreasonable for Bosch's expert to work closely with Bosch's counsel to design, execute, and explain the nature of his work. Accordingly, I am awarding Bosch $111,501.80 which reflects the full cost of the software audit. In light of this monetary award, I find Bosch's contemporaneous request for nominal damages as a "default" measure of harm to be without merit.

C. <u>Injunctive Relief</u>

Finally, I find that CSI's repeated and ongoing breaches of the 2019 EULA constitute irreparable harm that warrants the imposition of a permanent injunction. Indeed, CSI has admitted that it uses the CSR Software not only to "confirm" the accuracy of its own data, but to continually implement what it describes as "minor updates" to the CrashScan application. Resp's Post-Hearing Br., at 10. It is clear that the pendency of this proceeding has not dampened its willingness to commit these breaches of the EULA, as Mr. Hsu acknowledged that CSI generated a Bosch

7

report as recently as the Friday before the start of the final hearing to get a "second opinion" on information derived from the CrashScan application. Hearing Tr., Vol. 2, at 207. Given that these breaches occur entirely within the confines of CSI's private offices, it is both time consuming and difficult for Bosch to ascertain exactly when and how they are occurring, as well as which, if any, potential customers may be impacted. Accordingly, it is apparent that an equitable remedy is required to prevent further breaches.

Contrary to the arguments presented by CSI, I do not believe that an injunction would be "ruinous" to the company. Resp's Post-Hearing Br., at 21. Indeed, that assertion belies the evidence that CSI presented at the hearing that the CrashScan application does not need to rely upon the CSR Software, has derived only minimal benefit from Bosch's product, and does not target the same pool of customers. The scope of injunctive relief, however, must be narrowly tailored to the harm at issue. Although Bosch seeks the entry of an injunction requiring CSI to cease all use of its CrashScan application and supporting databases in their entirety, such a broad prohibition would only be justified by an equally serious breach of the 2019 EULA, such as the wholesale development of the CrashScan application through the copying of Bosch's source code. That did not happen here. The primary harm that needs to be remedied is CSI's ongoing effort to use the CSR Software to validate, update, and/or improve its own product in violation of the plain language of the 2019 EULA.

For these reasons, I am entering a permanent injunction as follows:

1. CSI, including its employees, owners, officers, contractors, and agents, shall be prohibited from using or possessing any version of the Bosch CDR Tool Software, including any version licensed to third-parties.

43189542.1/003229.00283

2. CSI shall, within ten (10) days of this Award, take all necessary steps to uninstall, remove and delete any copy of the Bosch CDR Tool Software in its possession, as well as any install files and activation certificates for same.

3. CSI shall, within thirty (30) days of this Award, take all necessary steps to permanently expunge from its database all data records relating to crash data derived or sourced in any way from the Bosch CDR Tool Software on or after July 9, 2019, the date CSI purchased a license covered by the 2019 EULA.

4. CSI shall, within forty-five (45) days of this Award, provide to Bosch a certification executed under oath that it has taken the steps ordered in paragraphs (1) through (3) above.

**Final Award**

For the reasons stated, I hereby find as follows:

1. CSI has breached ¶¶ 2.3.7 and 2.2.1 of the 2019 EULA.

2. Bosch is entitled to a monetary award in the amount of $111,501.80 reflecting the cost of the software audit performed by Mr. HelfinSiegel.

3. Therefore, Respondent, Collision Sciences Inc. shall pay Claimant, Bosch Automotive Service Solutions inc., $US111,501.80 within thirty (30) days of the receipt of this Final Award.

4. A permanent injunction is also entered against CSI as described in more detail above.

5. Other than the cost of the audit, each party shall bear its own fees and expenses.

6. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$18,975.00 and the compensation and expenses of the arbitrator totaling US$53,205.03 shall be borne as incurred.

7. This opinion is in full settlement of Bosch's claims against CSI. All prior dismissals of claims asserted in this Arbitration are expressly affirmed. Any other claims not expressly mentioned in this Opinion are denied.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Detroit, Michigan, United States.

_____
Thomas W. Cranmer
Arbitrator

Dated: January 10, 2025

43189542.1/003229.00283

State of STATE            )
                          )  SS:
County of COUNTY          )

I, Thomas W. Cranmer, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my/our Final Award.

Date January 10, 2025                     _____
                                          Thomas W. Cranmer, Arbitrator