# EXHIBIT H

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**COMMERCIAL ARBITRATION RULES**

Bosch Automotive Service Solutions Inc.,

        Claimant,

    v.

Collision Sciences Inc.,

        Respondent.

Case No. 01-21-0016-2306

Arbitrator: Thomas W. Cranmer

**<u>CLAIMANT'S POST-HEARING BRIEF</u>**

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

ISSUES ........................................................................................................................5

CONTRACT LANGUAGE AT ISSUE ......................................................................5

    A.    The 2017 Bosch CDR Tool Software EULA ......................................5

    B.    The 2019 Bosch CDR Tool Software EULA ......................................5

SUMMARY OF FACTS ..............................................................................................8

    A.    The Bosch CDR Tool Software ..........................................................8

    B.    The Market for the Bosch CDR Tool Products ...................................9

    C.    Collision Sciences' Agreement to the EULA Terms ...........................10

        1.    Collision Sciences' Agreement to the 2017 EULA ...................10

        2.    Collision Sciences' Agreement to the 2019 EULA ...................10

    D.    Background of CSI's Software Products .............................................11

    E.    CSI Characterized the CSI Software Platform as a Replacement for Bosch Software. ...............................................................................13

    F.    CSI's Unauthorized Use of the Bosch CDR Tool Software. ...............14

        1.    CSI's Use of the Bosch CDR Tool Software During the 2017 EULA. ...................................................................................14

        2.    CSI's Use of the Bosch CDR Tool Software During the 2019 EULA. ...................................................................................16

        3.    CSI's Characterization of its CrashScan Application and Platform During the term of the 2019 EULA. ...........................22

    G.    The Audit of Collision Sciences' use of the Bosch CDR Tool Software. .............22

LEGAL STANDARD....................................................................................................22

ARGUMENT ................................................................................................................23

    A.    CSI Breached both the 2017 EULA and the 2019 EULA. ..................23

        1.    Both the 2017 EULA and the 2019 EULA are enforceable contracts. .................................................................................23

        1.    CSI created a derivative work of the Bosch CDR Tool, in violation of both the 2017 EULA and the 2019 EULA. ...........24

        2.    CSI's CDR Replay Allows for the remote operation of Bosch's CDR Tool Software. ...................................................................26

        3.    CSI used the CDR Tool Software to compete with Bosch's products or services...................................................................27

       4.     CSI Reversed Engineered Bosch's CDR Tool Software to make its CDR Replay tool and to create its database..............................................28

B.     The Software Audit demonstrated unauthorized use of the Bosch CDR Tool Software by CS............................................................................31

REQUESTED RELIEF.......................................................................................................32

A.     A permanent injunction is warranted in these circumstances.................................32

B.     Bosch is entitled to at least nominal money damages............................................35

C.     Bosch is entitled to reimbursement for the costs of the Audit..............................35

D.     Requested Award from Arbitrator .........................................................................36

CONCLUSION...................................................................................................................37

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Audi AG v. D'Amato*,
469 F.3d 534 (6th Cir. 2006) …..……………………..……………………..…….. 33

*Basicomputer Corp. v. Scott*,
973 F.2d 507 (6th Cir. 1992) …..…………………………..…..……………………… 33

*Batton-Jajuga v. Farm Bureau Gen. Ins. Co.*,
322 Mich. App. 422, 913 N.W.2d 351 (2017) ……………..…………………….... 29

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) …..……………………..……………………………………… 25

*Cellnet Comm'ns, Inc. v. New Par*,
291 F. Supp. 2d 565 (E.D. Mich. 2003) …..…………………..…………………... 33

*Drouillard v. Am. Alt. Ins. Corp.*,
504 Mich. 919 (2019) …..……………………..……………………………………… 29

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) …..……………………..…………………………………… 33

*FirstEnergy Solutions Corp. v. Flerick*,
521 Fed. Appx. 521 (6th Cir. 2013) …..……………………..………………………… 33

*Fleet Eng'rs v. Tarun Surti & Mudguard Techs.*,
No. 1:12-cv-1143, 2017 U.S. Dist. LEXIS 229222 (W.D. Mich. June 8, 2017) ………. 28

*Holland v. Trinity Health Care Corp.*,
791 N.W.2d 724 (Mich. 2010) …..……………………..……………………………… 23

*Hoover Invs., Inc. v. City of Charlotte*,
No. 1:04-CV-689, 2006 U.S. Dist. LEXIS 20776 (W.D. Mich. Apr. 18, 2006) ………. 35

*ITT Educ. Servs. v. Arce*,
533 F.3d 342 (5th Cir. 2008) …..……………………..…………………………….... 33

*J.P. Morgan Sec., LLC v. Duncan*,
No. 2:22-cv-11732, 2022 U.S. Dist. LEXIS 143924 (E.D. Mich. Aug. 11, 2022) …...…. 33

*Kendzierski v. Macomb Cnty.*,
503 Mich. 296 (2019) …..……………………..………………………………….. 29

*Kewanee v. Bicron*,
    416 U.S. 470 (1974) ....……………………..……………………………………… 28

*Kolton v. Nassar*,
    358 Mich. 154 (1959) …..………………..……………………………….. 35

*Meagher v. Wayne State Univ.*,
    565 N.W.2d 401 (Mich. 1997) ….……………..………………………… 23

*Miller-Davis Co. v. Ahrens Constr., Inc.*,
    495 Mich. 161, (2014) ….…………..……………………………… 23

*Ormco Corp. v. Johns*,
    869 So. 2d 1109 (Ala. 2003) ….……………………..…………………… 33

*Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*,
    2016 IL App (1st) 142754, 59 N.E.3d 41 (2016) ….……………..………… 23

*Quinn v. City of Detroit*,
    23 F. Supp. 2d 741 (E.D. Mich. 1998) ….…………..……………………… 25

*S&S Innovations Corp. v. UUSI, LLC*,
    No. 1:18-cv-1377, 2021 U.S. Dist. LEXIS 70 (W.D. Mich. Jan. 4, 2021) ….………… 25

*SAS Inst., Inc. v. World Programming Ltd.*,
    874 F.3d 370 (4th Cir. 2017) ….………………….…………………….. 29

*Shirley v. Rocket Mortg.*,
    No. 2:21-cv-13007, 2022 U.S. Dist. LEXIS 119855 (E.D. Mich. July 7, 2022)……….. 23

*SimplexGrinnell, LP v. Integrated Sys. & Power, Inc.*,
    642 F. Supp. 2d 206 (S.D.N.Y. 2009) ….……………………..……………… 26

*Traton News, LLC v. Traton Corp.*,
    528 F. App'x 525 (6th Cir. 2013) ….…………………..…………………….. 23

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021) ….……………..……………………………… 35

*Van Buren Charter Twp. v. Visteon Corp.*,
    904 N.W.2d 192 (Mich. Ct. App. 2017) ….……………………..…………… 23

*Viking Grp, Inc. v. Bruckman*,
    No. 347778, 2020 Mich. App. LEXIS 3237 (Ct. App. May 7, 2020) ….……………... 35

*York Risk Servs. Grp., Inc. v. Couture*,
   787 F. App'x 301 (6th Cir. 2019) …..………………………..…………………………… 32

**Other Authorities** **Page(s)**

Black's Law Dictionary (11th ed. 2019) …...……………………...………………………… 28

<u>**CLAIMANT'S POST-HEARING BRIEF**</u>

<u>**INTRODUCTION**</u>

This dispute involves the misuse by Collision Sciences Inc. ("Respondent" or "CSI") of Bosch Automotive Service Solutions Inc.'s ("Claimant" or "Bosch") Bosch CDR Tool Software in violation of two End User License Agreements (EULAs) that govern such use.

Almost 25 years ago, Bosch developed the first tool for retrieval of data from automotive Event Data Recorders ("EDRs"), and Bosch is now the world leader in EDR retrieval tools. An EDR is a device installed in a motor vehicle to record technical vehicle and occupant information for a brief period of time before, during and after a crash. Since 2000, Bosch has developed and sold EDR retrieval tools under its Crash Data Retrieval ("CDR") brand, allowing for a standard method of retrieving and analyzing EDR data from nearly all vehicles involved in crashes regardless of the vehicles' OEM. Since starting out offering a tool for a single automotive OEM, Bosch has gradually grown its products - which include hardware and specialized cables for connecting to a vehicle, and software for retrieving and analyzing EDR data - to now cover vehicles from more than 25 OEMs.

Bosch invests substantial resources and time in the development and maintenance of its CDR Tool products. Development of the CDR products is continuous as new vehicles are constantly being added by the OEMs and the specifications for existing vehicles may change. Since the OEMs are required to ensure a commercially-available product is able to retrieve EDR data, development of Bosch's products requires extensive collaboration with the OEMs, who also expend significant resources testing and validating Bosch's products before the products are released. The OEMs share their confidential and proprietary specifications and requirements for retrieving EDR data with Bosch pursuant to strict confidentiality agreements. Bosch does not

receive payment from most of the OEMs, but instead receives a license to the OEMs'
specifications and data, allowing Bosch to recoup its investment by selling the hardware and
offering subscriptions to its software. Thus, in order to continue to offer crash data retrieval
products, it is imperative that a market for Bosch's hardware and software continues to exist and
be robust.

Jason Bayley started CSI in 2015 with the express purpose of short-circuiting Bosch's
CDR Tool products by developing a way to obtain EDR data through a wireless connection to a
vehicle. Mr. Bayley extensively marketed CSI's product as being offering the ability to obtain
the same crash data retrieved by the Bosch CDR Tools at a cheaper price. Bayley's initial intent
was for the CSI product to deliver the authentic Bosch CDR Report using the wirelessly
retrieved data, and, while eventually providing a CSI-branded report, the CSI maintains the
ability to provide a Bosch CDR Report, and frequently does so upon customer request.

In order to build the mobile application, however, CSI needed to figure out how to
accurately and reliably actually communicate with and retrieve EDR data from a vehicle.
Without access to the OEMs' specifications and requirements, CSI resorted to reverse
engineering the Bosch CDR Tool Software by building a "virtual vehicle EDR." CSI's reverse
engineering tool, which it named "CDR Replay," allowed CSI to use data from existing reports
generated from the Bosch CDR Tool Software, simulate a vehicle's EDR, and manipulate the
Bosch CDR Tool Software into acting as if it were directly connected to an actual EDR module
installed in a vehicle. CDR Replay's setup allows CSI to capture the commands and messages
issued by the Bosch CDR Tool Software, permitting CSI to build a database of commands and
protocols for EDR retrieval. CSI then uses the commands and protocols obtained via CDR
Replay in its own application for remote collection of EDR data. CDR Replay further allows any

retrieved EDR data, including the data retrieved via CSI's mobile application, to be fed into the actual Bosch CDR Tool Software, thus allowing CSI to produce a Bosch CDR Report from data retrieved remotely.

In order to reverse engineer the processes for retrieving EDR data and develop its own product, CSI purchased at least two licenses to the Bosch CDR Tool Software. CSI's license purchase was obviously not for the intended use of the Bosch CDR Tool Software– *i.e.*, connecting the software via a PC directly to a vehicle and obtaining analysis of the EDR data. CSI proceeded to use the Bosch CDR Tool Software to: 1) decipher how the Bosch software communicates with and retrieves EDR data using the CDR Replay tool; 2) generate Bosch CDR Reports using EDR data obtained via CSI's wireless mobile application ("remote data collection"); 3) generate Bosch CDR Reports from remote data collection for use in marketing materials as comparison to CSI's crash reports; 4) generate Bosch CDR Reports from remote data collection and provide to paying customers upon request; 5) add information for new vehicles into the databases used by its mobile application; 6) troubleshoot errors or anomalies in results produced by CSI's mobile application; and 7) use as a general "second opinion" against the results produced by CSI's mobile application.

Upon installing and activating the Bosch CDR Tool Software, CSI agreed to and entered into the relevant End User License Agreement ("EULA") applicable at the time of activation. The EULAs CSI agreed to are binding contracts that governed how CSI was permitted to use the Bosch CDR Tool Software. The operative EULAs in this arbitration prohibit, among other things, creating derivative works, reverse engineering, using the Bosch CDR Tool Software with connections other than the Bosch CDR Tool Hardware, obtaining data via remote or wireless transmission, and using the Bosch CDR Tool Software in any way that competes with Bosch's

products or services. In other words, each of the ways that CSI has proceeded to use the Bosch CDR Tool Software is expressly prohibited by one of both of the operative EULAs.

Despite protestations to the contrary, CSI has used, and continues to use, the Bosch CDR Tool Software in unauthorized ways during the terms of both of the operative EULAs. The evidence of CSI's unauthorized usage under both EULAs is overwhelming, and not credibly in dispute. Remarkably, CSI has continued to use the Bosch CDR Tool Software in obviously unauthorized ways through the duration of this Arbitration – admitting, even, that a Bosch report was generated "to get a second opinion" on September 6, 2024, just one business day before the start of the Arbitration hearing.

CSI's actions, as detailed further below, are in breach of both EULAs at issue in this Arbitration. As a result, Bosch is entitled to an award of a permanent injunction prohibiting CSI from any further use of the Bosch CDR Tool Software and requiring CSI to expunge from its software and databases all data and other information obtained or derived from its unauthorized use of the Bosch CDR Tool Software. The development and continued maintenance of CSI's product is so dependent on the use of the Bosch CDR Tool Software that it simply could not exist without the Bosch software. Therefore, the injunction should require CSI to cease all use of any interaction of its CrashScan product and database existing since CSI has agreed to the EULAs at issue. Alternatively, CSI should be ordered to remove all data contained in its databases created during the terms of the operative EULAs. Furthermore, Bosch is further entitled to an award of nominal damages for CSI's breaches, as well as reimbursement of the costs of the software audit which uncovered CSI's unauthorized use of the Bosch CDR Tool Software.

<u>ISSUES</u>

The issues to be decided in this arbitration are as follows:

1) Whether CSI used the Bosch CDR Tool Software in an unauthorized manner and thus breached the 2017 EULA;

2) Whether CSI used the Bosch CDR Tool Software in an unauthorized manner and thus breached the 2019 EULA;

3) Whether the audit uncovered unauthorized use of the Bosch CDR Tool by CSI and, thus, CSI is required to reimburse Bosch for the costs of the audit; and;

4) If CSI breached either or both the 2017 EULA and the 2019 EULA, what remedy is Bosch entitled to receive.

<u>CONTRACT LANGUAGE AT ISSUE</u>

There are two End-User License Agreements ("EULA") associated with the Bosch CDR Tool Software at issue in this arbitration. The first is the EULA in effect for software versions 17.2 – 17.7, which came into effect with the release of version 17.2 on January 22,2017 (the "2017 EULA"). (**Hrg. Tr.** 45:14-21; **Ex. 1**; **Hrg. DEMO 1**.) The second is dated May 31, 2019, and came into effect with the release of version 19.0 on June 6, 2019, and has been applicable to all versions of the software since (the "2019 EULA"). (**Hrg. Tr.** 45:22 – 46:19; **Ex. 2**; **Hrg. DEMO 1**.)

A.     <u>The 2017 Bosch CDR Tool Software EULA</u>

The 2017 EULA (**Ex. 1**) prohibits users from preparing derivative works:

> 1.3. "Except for the right of use pursuant to Article 1.1, Licensor reserves all rights for the Licensed Software, in particular exclusive right to reproduce, to distribute, **to prepare derivative works** therefrom and to publicly display Licensed Software." (Emphasis added.)

B.     <u>The 2019 Bosch CDR Tool Software EULA</u>

The 2019 EULA (**Ex. 2**.) prohibits users from remote, wireless, or alternative connections to the CDR tool:

2.2. Delivery and Installation.

    2.2.1. Provided you retain a valid Subscription issued by the Bosch CDR Software License Service (VLMS), You may implement activation of the Software only on the Designated Equipment provided that the Designated Equipment meets the minimum requirements according to Bosch's recommendations as outlined in the Related Materials. "Related Materials" shall mean all materials other than the Software furnished by Bosch and including, for example, Getting Started Guide, CDR Help File, instructional documentation, guides, and all permitted copies of such material made by Licensee. **Connections to vehicles and or electronic control units (ECU) for the purposes of retrieving data must be done by directly connect the CDR tool to the vehicle or ECU using CDR tool cables and/or adaptors approved by Bosch. Any connections to a vehicle or ECU through additional hardware and software which is not part of the CDR tool is prohibited including, but not limited to, indirectly connecting the CDR tool through a wireless OBDII communications device, enabling remote connection to CDR tools over a server or internet server.** (Emphasis added.)

The 2019 EULA expressly prohibits users from reverse engineering or otherwise attempting to derive the software's architectural framework, prohibits remote use, from preparing derivative works, and using the software in competition with Bosch:

    2.3. Restrictions on Your Use of the Software. The Software or its components may be used only as expressly authorized in this EULA, and in no other way. **You expressly agree NOT to**:

    2.3.1. In whole or in part, alter, copy, disassemble, decompile, **reverse engineer, decode**, or otherwise attempt to access or derive the source code or **architectural framework of the Software**; (Emphasis added.)

    2.3.3. Unless otherwise agreed in writing by Bosch, use the Software as server software for making the Software available for multiple users (simultaneous use) **over a network**, install it on a server and **allow users to access to the Software remotely** for the purpose of multi-user access, or install the software on a device for use only by remote users; (Emphasis added.)

    2.3.5. Modify in any way or prepare **derivative works** of the source or object code of the Software; (Emphasis added.)

    2.3.7. Use or permit any other person to use the Software in any way that **competes with Bosch**'s products or services, except as expressly permitted by applicable law; (Emphasis added.)

The 2019 EULA further reserves to Bosch all rights not expressly granted, including the right to prepare derivative works:

> 2.4. Except for the right of use pursuant to Section 2.1, **Bosch reserves all rights for the Software, in particular exclusive right to** reproduce, to distribute, to **prepare derivative works therefrom** and to publicly display the Software. (Emphasis added.)

The 2019 EULA automatically terminates if users fail to comply with any of the terms and conditions:

> 6. TERM/ DURATION
>
> 6.3. **This EULA shall automatically terminate immediately and without notice to You if: (a) You fail to comply with any of the terms and conditions of this EULA**. In such event, You must return, destroy, erase, and/or delete all copies of the Software, in their entirety, that are in your custody or control; or (b) You purchase an activation certificate to enable additional functionality of the Software at which time the terms and conditions of the Activation EULA will supersede this EULA. (Emphasis added.)

The 2019 EULA establishes the right to a permanent injunction:

> 8. CONFIDENTIALITY OF THE SOFTWARE
>
> 8.1. You acknowledge and agree that parts of the source code for the computer programs underlying the Software are a Bosch trade secret. You agree that any efforts by You to **reverse engineer**, decode decompile, disassemble or otherwise attempt to access or derive the source code or architectural framework of the Software, or any other efforts to learn the contents of such source code, data bases or resource files and applications could result in Your access to or knowledge or disclosure of such trade secrets without Bosch's permission, and that such access, knowledge, or disclosure could violate Bosch's trade secret rights and **cause Bosch immediate and irreparable injury, entitling Bosch to obtain a preliminary and/or permanent injunction against You**. (Emphasis added.)

The 2019 EULA establishes the right to an audit and reimbursement for the audit's costs if unauthorized use of the Software is discovered by the audit:

> 10. SOFTWARE AUDIT.
>
> 10.1 During the term of this EULA and at any time during the two (2) years thereafter, Bosch may audit Your use of the Software with advance

written notice. You shall cooperate with the audit, including by providing access to any books, computers, records, or other information that relate or may relate to use of the Software. Such audit shall not unreasonably interfere with Your business activities. If Vendor discovers unauthorized use, reproduction, distribution, or other exploitation of the Software, **You shall reimburse Bosch for the reasonable cost of the audit**, or of the next audit in case of discovery without an audit, in addition to such other rights and remedies as Bosch may have. (Emphasis added.)

## SUMMARY OF FACTS

A.    **The Bosch CDR Tool Software**

Bosch's CDR Tool Software is a specialized program designed to retrieve, decode, and analyze EDR information from vehicles involved in accidents. (**Ex. 6**, p.2; **Hrg. Tr.** 18:16-19:13.) The software works in conjunction with Bosch's CDR hardware, including specialized connecting cables that provide a physical connection between a PC and a vehicle's electronic control module(s). Bosch's CDR hardware can be plugged into to a vehicle's Diagnostic Link Connector ("DLC") (aka an OBD II port), or directly to an electronic control module, such as an air-bag control module. (**Ex. 6**, p. 2, 11; **Hrg. Tr.** 17:1-18, 34:6-19.) The CDR Tool Software supports a wide range of vehicle makes and models, providing detailed reports on various parameters such as vehicle speed, brake application, throttle position, and airbag deployment. (**Ex. 6**, p.8-10; **Hrg. Tr.** 15:24-17:18.)

The Bosch CDR Tool Software retrieves EDR data from thousands of different motor vehicles based on proprietary specifications and protocols from OEMs. (**Ex. 6**, p. 8-9; **Hrg. Tr.** 15:17-22.) The specifications and protocols are part of a database that allows the Bosch CDR Tool Software to know how and where a particular vehicle's EDR data can be accessed, and how to interpret that data once retrieved. (**Hrg. Tr.** 16:12-17:18.) This database is the result of extensive collaboration between Bosch and the OEMs and represents a significant investment of time and resources by Bosch. (**Ex. 6**, p. 8-9; **Hrg. Tr.** 25:4-27:10, 31:4-12.) Bosch works closely

with OEMs in an iterative process to test Bosch software and update OEM specifications to meet reliability requirements, including ISO certification requirements. (**Ex. 6**, p. 8-9**; Hrg. Tr.** 25:4-27:10.)

Bosch regularly updates both the software and its underlying database to include support for new vehicle models, refine data interpretation algorithms, and enhance overall capabilities, ensuring the CDR Tool remains current and accurate. (**Ex. 6**, p. 7-9; **Hrg. Tr.** 20:4-21, 25:4-27:10.) The software's ability to produce standardized, court-admissible reports has made it a crucial resource in legal proceedings and insurance claim investigations related to vehicle accidents. (**Ex. 6**, pp. 12, 14-19, **Hrg. Tr.** 15:17-22, 34:20-35:25, 38:1-39:3.)

**B.** **The Market for the Bosch CDR Tool Products**

As noted above, the Bosch CDR Tool consists of hardware, specialized cables, and software. A basic kit, including the hardware required to connect a PC to a vehicle OBD II port, is sold in North America through Bosch's distributor for a retail price of about $5,800. (**Ex. 6**, p. 12; **Hrg. Tr.** 36:1 – 37:24.) The required software is sold as a one year subscription at a price of $1,200, which entitles the purchases to receive all updates during the 1-year term. *Id.*

The Bosch CDR Tool is used by various different users for the reconstruction of vehicle accidents. Bosch's customers for the Bosch CDR Tool in North America are law enforcement, independent accident investigators, OEMs, fleet owners, insurance companies and vehicle safety researchers. (**Ex. 6**, p. 13-14; **Hrg. Tr.** 38:1 39:15.) As of 2019, law enforcement and the private sector accounted for the majority of Bosch's customers, with insurance companies accounting for roughly 10%. *Id.* At that time, Bosch expected that the number of insurance customers, using the CDR Tool for fraud detection and other purposes, would expand. (**Ex. 6**, p. 16; **Hrg. Tr.** 39:18 – 40:24.) There has been some increase in insurance company customers, growing from

about 300 subscriptions in 2019 to now about 390 subscriptions, but not what was expected back

in 2019. (**Ex. 6**, p. 17; **Hrg. Tr.** 39:25 – 41:24.)

C.      **Collision Sciences' Agreement to the EULA Terms**

CSI purchased multiple licenses for Bosch's CDR Tool Software over a period of years,

each time agreeing to the terms of the applicable EULA. Each subscription came with an

activation certificate for the then current version of the software and allowed CSI access to every

subsequent version, with a corresponding activation certificate, released during the one-year

term. In order to access the full extent of the software, a user is required to install the certificate,

agreed to certain conditions, and acknowledge that use of the software is governed by the

applicable EULA. (**Hrg. DEMO 2**; **Hrg. Tr**. 48:4 – 50:5.) The user is given the opportunity to

download and review the EULA prior to clicking a check-box in the software acknowledging the

agreement. *Id.*

1.      **Collision Sciences' Agreement to the 2017 EULA**

On January 26, 2018, CSI purchased a one-year license subscription to the Bosch CDR

Tool Software. (**Ex. 4**; **Hrg. Tr.** 233:4-8.) On the same day, Mr. Bayley received an email with a

Subscription Activation Certificate for version 17.6 of the Bosch CDR Tool Software, and

subsequently forwarded it via email to Mr. Hsu. (**Ex. 52**; **Hrg. Tr.** 233:12-13.) Mr. Bayley did so

for Mr. Hsu to install and activate the license. (**Hrg. Tr.** 233:14-16.) The EULA for version 17.6

was dated April 11, 2017, and governed software versions 17.3 - 17.7 (the "2017 EULA"). This

license entitled CSI to receive updates through version 17.10. (**Hrg. DEMO 1**.)

2.      **Collision Sciences' Agreement to the 2019 EULA**

On July 9, 2019, CSI purchased another one-year license subscription to the Bosch CDR

Tool Software. (**Ex. 144**; **Hrg. Tr.** 233:17-234:13.) Again, on the same day, Mr. Bayley received

a Subscription Activation Certificate for version 19.0. (**Ex. 144**; **Hrg. Tr.** 234:1-6.) Mr. Bayley

again forwarded the email with the certificate to Mr. Hsu, for the purpose of installing the certificate and activating the software. (**Ex. 144**; **Hrg. Tr.** 234:7-10.) The EULA for version 19.0 was dated May 31, 2019, and has been in effect since the release of that version (the "2019 EULA"). (**Ex. 2**; **Hrg. Tr.** 45:22 – 46:19.) This license entitled CSI to receive updates through version 19.4 of the Bosch CDR Tool Software. (**Hrg. DEMO 1**.)

## D.      **Background of CSI's Software Products**

CSI developed three main components: the CrashScan mobile application, which scans vehicles remotely and uploads retrieved crash data to CSI's databases for later generating CDR reports; the CDR-Replay tool, which CSI described as a virtual vehicle EDR that incorporates Bosch CDR Tool Software to generate Bosch CDR reports without a physical vehicle connection; and the CSI databases for storing retrieved crash data as well as vehicle commands and protocols for generating CDR reports and for "replaying" the retrieved crash data using CDR replay and the Bosch CDR Tool Software. (**Ex. 39** ¶¶ 16 ,17, 29-63.7, 65-74; **Hrg. Tr.** 167:24-168:22, 145:21-146:18.)

CSI initially began developing CDR Replay, through their ability to extract Parameter Identification (PID) data from a communication "trace" and replay it into the Bosch CDR software. CSI used pre-existing EDR data from Bosch CDR reports to feed it into Bosch CDR Tool Software using CDR Replay and monitored the communications between the two software. (**Ex. 39, ¶¶** 33-50; **Hrg. Tr.** 129:7-13.) To support this process, CSI utilized BUSMASTER, a packet-sniffer software commonly used in reverse engineering efforts, to monitor and record the data requests or "traces" the Bosch CDR Tool Software made in response to the inputted EDR data. (**Ex. 37** (video); **Ex. 39**, **¶¶** 30, 33-35; **Hrg. Tr.** 124:20-24; 174:13-14.) By capturing these data requests and analyzing the output from real vehicle data, CSI was able to build a comprehensive database of Bosch software commands and protocols, forming a foundation for

their own EDR data retrieval tool, including CDR Replay and CrashScan app. (**Ex. 37** (video); **Ex. 39**, ¶¶65-74; **Hrg. Tr.** 144:5-147:5.)

CSI then began developing remote operations, database refinement, and fully automating the generation of CDR reports, developing scripts like "AutoCDR.au3" and "CarCrash.exe" to facilitate control of the Bosch CDR software, including the automated saving of reports. (**Ex. 39**, ¶¶ 48, 54; **Hrg. Tr.** 125:7-16, 144:5-17.) Using these tools and software obtained through their use of Bosch CDR Tool Software, CSI eventually developed a mobile application called "CrashScan" for wirelessly collecting EDR data from vehicles. The CrashScan application allows users to scan and transmit vehicle data to CSI's database, and then obtain a "crash report" for the vehicle via a download link received by email from CSI. (**Ex. 39**, ¶¶ 16 and 17; **Hrg. Tr.** 176:1-18.)

CDR Replay continued to be developed and operates on a computer equipped with Bosch CDR Tool Software and access to CSI's online database. This setup connects to a vehicle communication interface via a USB cable and potentially a standard On-Board Diagnostic (OBD) to USB converter, forming connections that allow both the Bosch CDR Software and CDR Replay to operate on separate computer ports. (**Ex. 39**, ¶¶ 30, 65; **Hrg. Tr.** 153:1-15, 180:13-18, 213:12-13, 215:13-216:12.) In order to run CDR Replay, data from CSI's database, including crash data and is accessed and reformatted for compatibility. A Python script then converts this formatted data into a special replay file that runs CDR Replay as it interfaces with the Bosch software, tricking it into processing the data as if it were directly connected to a real vehicle. CSI simultaneously runs BUSMASTER with CDR Replay and Bosch CDR Tool Software in order to troubleshoot errors by monitoring communications. (**Ex. 37** (video); **Ex. 39**, ¶¶ 30, 34; **Hrg. Tr.** 131:4-132:22, 133:15-138:2.)

CSI's database includes different types of vehicle-related data, such as VIN numbers, makes, models, years, and JSON-formatted EDR. This database has evolved from a basic system to a more complex structure hosted on Amazon Web Services. The AWS version includes detailed rows of vehicle-specific information and data entry information, and is primarily populated through data uploads from CSI's CrashScan app. For example, the database includes "date_created" and "date_modified" columns that allows users to sort and filter entries chronologically, providing insights into the timeline of data additions and modifications. (**Ex. 39**, ¶¶ 36.1, 68, 69.) Additionally, the user is able to use SQL queries to further sort the data based on specific software versions, like "CDR v19.0," enabling detailed analysis of the associated EDR data. (**Ex. 39**, ¶¶ 72, 73).

E.      **CSI Characterized the CSI Software Platform as a Replacement for Bosch Software.**

        Almost from the beginning, to prospective customers, partners and investors, CSI constantly marketed its application and services as a direct replacement to purchasing the Bosch CDR Tool hardware and software subscriptions. (**Hrg. Tr.** 245:14 – 24.) For example, CSI created a Strategic Business Proposal described as a "cost-benefit analysis of data retrieval, analysis & reporting solutions …" (**Ex. 143**.) While "encouraging the reader" not to consider the CSI solution as a direct comparison to the Bosch CDR Tool, the document nevertheless includes a substantial number of comparisons between the products, and, as acknowledged, compares the products financially as well. *Id.,* p.4. In the document, CSI claims that its solution is over $90,000 cheaper in upfront costs, and over $400,000 cheaper per year of operating costs, as a direct replacement of having 10 users of the Bosch CDR Tool. *Id.*, p.5. CSI further includes in the document a very detailed scenario providing the financial benefits where the CSI solution is a direct substitution for the Bosch tool. *Id.*, p. 13. Furthermore, as justification for its claim that it

takes less time to review a CSI crash report, CSI attached to the document a Bosch CDR Report and a CSI Claims report for the same vehicle "to exhibit the difference." (*Id*., pp. 16, 24, 34.) The Bosch CDR report was produced on May 16, 2019 by v. 17.10 of the Bosch CDR Tool Software, licensed to CSI. (*Id.*, p. 34.)

The Strategic Business Proposal document was shared with potential customers and clients. (**Hrg. Tr.** 243:6 – 13). It was shared at least with a consultant helping CSI with selling to Wawanesa Insurance on December 7, 2018 (**Ex. 140**; **Hrg. Tr.** 241:8 – 23), a representative of Mapfre USA Insurance on March 5, 2020 (**Ex. 32**), and a representative of Farmers Insurance on February 21, 2020 (**Ex. 179**).

## F.     CSI's Unauthorized Use of the Bosch CDR Tool Software.

CSI has a clear pattern of unauthorized use of the Bosch CDR Tool Software. This unauthorized use spans both the 2017 and 2019 EULA periods and involves multiple violations of the license agreements. CSI's actions go far beyond the scope of permitted use, including reverse engineering, creating derivative works, and using the software to compete directly with Bosch's products. The following examples, supported by documentary evidence and testimony, illustrate a small sample of the extent and nature of CSI's unauthorized use. These instances not only breach the specific terms of the EULAs but also undermine the very purpose of the licensing agreement and threaten Bosch's market position.

### 1.     CSI's Use of the Bosch CDR Tool Software During the 2017 EULA.

1.(a)     February 21, 2018, B. Hsu uses CDR Replay to generate Bosch CDR Report and sends to C. Hsu ("The attached PDF is the report for your car. Raw data from the scan are stored in the database on the server, so I can use those data and "replay" back to the Bosch tool and make it generate a report.") Attaching Bosch CDR Report using v. 17.6.1, licensed to "Collision Sciences." (**Ex. 61**;)

1.(b)     April 3, 2018, CDR Reply video is created. (**Ex. 37**.)

1.(c)  April 4, 2018, J. Bayley sent an email to T. Walsh, indicating that CSI's technology has the "ability to Replay the raw crash data into Bosch CDR Tool." (**Ex. 139;** Hr. Tr. 236:2-25.)

1.(d)  April 12, 2018, J. Bayley sent an email to The Commonwell Ins., attaching a presentation and a Bosch CDR report "for the Buick from the live app demo." For deliverables, offers the "engineer's Bosch Crash Data Retrieval Report," for a fee of "$275 for us to process the data into the Bosch PDF report (the fee is the same for digital processing or lab processing of an airbag module)." (**Ex. 166**.) Attached Bosch CDR Report for 2017 Buick Enclave, imaged on April 12, 2018, using v. 17.7.1, licensed to Collision Sciences. (**Ex. 167.**) Presentation includes screenshot from CDR Replay video of April 3, 2018, including link to video. (**Ex. 168** at slide 33 (CS00454787).)

1.(e)  On April 16, 2018, B. Hsu used CDR Replay to fix an error in CSI's code: "Investigated CDR replay for Toyota Cable 617. … The CDR stopped asking PIDS after 0x0F, but was supposed to ask for more;" "Made a replay file for Cable 617 …;" "Found an error in the calculation …;" "Fixed the error in the vehicle.py." (**Ex. 69** at p.2.)[1]

1.(f)  On April 21, 2018, B. Hsu used CDR Replay to check on discrepancies for vehicles having same part number, and made adjustments to CSI's app: "The 2013 Ford Escape scanned yesterday and the 2014 Ford Escape share the same part number, but the crash data locations are different. Compared to other vehicles that use cable 783, the crash data locations are all different. I marked them as 'M' for manual processing via CDR replay and just not report anything in app for the time being" (**Ex. 69** at p.6.)

1.(g)  On April 25, 2018, B. Hsu used CDR Replay and made adjustments to CSI code: "Replayed a 2015 Ford Focus, but the CDR asked for an additional PID at the very end (22 F1 25). I added that PID to our request list. Since there could be more PIDs after the F1 25, we need to find similar cars and take a trace to get all PIDs. This vehicle uses cable 783." (**Ex. 69** at p.7.)

1.(h)  On April 26, 2018, B. Hsu used CDR Replay to resolve issues with reporting in CSI's application: " Got started with the 2013 Corolla Matrix resolution issue. The longitudinal delta-v is not interpreted the same way as other EDR 12 modules. This module uses cable 613, which is technically a K-Line cable.

---

[1] The descriptions attached to Mr. Hsu's invoices detail the work he did during the time period of the invoice. *See* **Hrg. Tr.** 201:2 – 7. Mr. Hsu's invoices are at **Hrg. Exs. 70, 71, 72, 73 and 128**. The use of the terms "replay" and "replayed" in Mr. Hsu's descriptions mean he used CDR Replay to create a Bosch CDR Report (unless it was a Hyundai or Kia automobile). *See* **Hrg. Tr.** 206:13 – 15.

I still need to figure out how to decode the delta-v from this module." (**Ex. 69** at p.7.)

1.(i)  On April 30, 2018, B. Hsu used CDR Replay to test the operation of the CSI application: "Tested using the DLC connector and confirmed that we can test MS-CAN using Busmaster. We can run CAN commands through the DLC adapter for PCAN, and the MX can communicate with Busmaster using MS-CAN (STP 53) with a baud rate of 500,000 bps. Even in STP 53 mode, the dongle still prints out BUFFERFULL in text, so we would still be able to know when the buffer gets full regardless of whether a particular vehicle uses standard CAN or MS-CAN." (**Ex. 69** at p.9.)

1.(j)  On November 22, 2018, R. Pedrosa worked on the code for CDR Replay, writing to B. Hsu and J. Bayley "Got the CDR Replay for VPW working. So far it reads the json file, finds the correct requests and responses, replies correctly to the CDR and the CDR continues the process. While doing that, it also sends a keep alief [sic] message to signal to the CDR that it os [sic} still there." (**Ex. 54**; **Hr. Tr.** 217:10-20.)

1.(k)  On December 7, 2018, J. Bayley sent an email to T. Walsh re: "Wawanesa follow-up," attaching a sample CS and Bosch reports for the same 2017 RAM 1500, with Bosch report imaged on 6/8/2018 using v. 17.7, licensed to Collision Sciences. (**Ex. 140**.)

1.(l)  Between October 27 and December 20, 2018, R Pedroso worked on programming CDR Replay, including "the VPW CDR replay programming and the Honda K-Line tests," using the Bosch CDR Tool Software to do so (email of December 31, 2018, to J. Bayley attaching invoice) (**Ex. 136**.)

## 2.  CSI's Use of the Bosch CDR Tool Software During the 2019 EULA.

Between July, 2019 when CSI first obtained version 19.0 of the Bosch CDR Tool Software and November, 2021, CSI used its CDR Replay tool with the Bosch CDR Tool Software almost 2500 times. (**Hrg. Tr.** 190:3-16.) Its use of the Bosch CDR Tool Software, included, but was not limited to, the following:

2.(a)  On August 22, 2019, J. Bayley sent an email to M. Conlon, The Guarantee Co. of N.A., attaching a CrashScan report and a Bosch CDR Report for the same 2010 Toyota Rav4, from a vehicle scanned using CrashScan by an employee of The Guarantee. (**Ex. 126**) The Bosch CDR Report was generated with version 19.0, licensed to "Collision Sciences." (*Id.* at p.17.)

2.(b)  On September 20, 2019, J. Bayley sent an email to M. Conlon, The Guarantee Co. of N.A., sending a Bosch CDR Report and a CrashScan

Report for a 2017 Audi RS7 scanned using the CrashScan application. (**Ex. 151**.) J. Bayley wrote "We immediately did a replay into the Bosch CDR as the Delta V is very high … and I can confirm that this value matches the Bosch CDR Report… I can explain further how we do this, but essentially, we send the Bosch tool the exact hex data from the EDR." The Bosch CDR Report was generated with version 19.1, licensed to "Collision Sciences." (*Id.* at p.3.)

2.(c)    On September 25, 2019, B. Hsu used CDR Replay to produce a Bosch CDR Report for a 2012 Toyota Camry, per the direction of J. Bayley to "please do a replay," in order to respond to an inquiry from B. Whiteside of American Family. (**Ex. 152**.) The Bosch CDR Report was generated with version 19.1, licensed to "Collision Sciences." (*Id.* at p.3.)

2.(d)    On January 2, 2020, B. Hsu used CDR Replay to check "the 2016 Toyota Corolla scanned by Theuns," noting that the CSI report has a different value for delta-V than the Bosch CDR Report, and that "it is unclear how the CDR knew to treat those data bytes as invalid (greyed out in the report)." (**Ex. 70**, p.2.)

2.(e)    On January 5, 2020, B. Hsu used CDR Replay on a scan from "AmFam Hub" for a 2011 Toyota Camry, noting an issue that required a "modification in server code." (**Ex. 70**, p.4.)

2.(f)    On January 8, 2020, B. Hsu used CDR Replay to check two AmFam reports on a 2010 Toyota Corolla and a 2011 Ford Fusion, noting that "[e]verything looked good." (**Ex. 70**, p.6.)

2.(g)    On January 9, 2020, B. Hsu generated a Bosch Report to check the data on a CSI report purchased by GCNA for a 2010 GMC Sierra, after which he released the report. (**Ex. 70**, p.6.)

2.(h)    On January 9, 2020, B. Hsu generated a Bosch Report from a sample report for a 2016 BMW 428i, and noted certain conditions in the Bosch Report, prompting him to make changes in the "crash data processing code." (**Ex. 70**, p.7.)

2.(i)    On January 9, 2020, B. Hsu generated a Bosch Report for a 2012 Nissan VERSA scanned by AmFam, noticed a difference in the data between the two reports, and modified the Python code. (**Ex. 70**, p.7.)

2.(j)    On January 9, 2020, B. Hsu Bosch Report for a 2006 Toyota Sienna scanned by AmFam, and released it after "fixing an issue with the roll event." (**Ex. 70**, p.7.)

2.(k)    On January 10, 2020, B. Hsu used CDR Replay to generate a Bosch CDR Report for a 2012 Nissan VERSA scanned using the CrashScan application, and emailed J. Bayley detailing a discrepancy between the Bosch CDR

Report and the Collision Sciences report. (**Ex. 124**.) The Bosch CDR Report was generated with version 19.2, licensed to "Collision Sciences." (**Ex. 125**.)

2.(l)   On January 11, 2020, B. Hsu generated a Bosch CDR Report for a 2007 Toyota Sienna, and released it after checking the data. (**Ex. 70**, p.7.)

2.(m)   On January 13, 2020, B. Hsu used CDR Replay to test the K-Line version for Ford, Honda and Toyota, making changes in the code and updated the Ford process to use the correct JSON file for commands. (**Ex. 70**, p.8.)

2.(n)   On March 16, 2020, B. Hsu used CDR Replay to review and release a report for a 2004 Toyota Camry scanned by AmFam, and used CDR Replay to review and release a report for a 2014 Nissan Versa. (**Ex. 71**, p.2.)

2.(o)   On March 22, 2020, B. Hsu used CDR Replay to review a 2001 GMC Yukon XL scanned by AmFam Ethos, as the generated report said manual review required. Hsu added Yukon XL for model years 2001 to 2005 to the database, and added "more checks" to the processing code because it gave out random values. (**Ex. 71**, p. 5.)

2.(p)   On March 23, 2020, B. Hsu used CDR Replay to check a scan of a 2018 Toyota Hilux, where certain items were different from the Bosch CDR Report. Mr. Hsu noted that the CDR Report regarded certain data differently and he could "not figure out how the CDR determined that." He sent the Bosch report to the customer "in case he needed to proceed with the claim." (**Ex. 71**, p.6.)

2.(q)   On March 24, 2020, B. Hsu used CDR Replay to review two AmFam GM VPW reports, which he confirmed with the CDR Report that it contained no crash data. (**Ex. 71**, p.7.)

2.(r)   On March 25, 2020, B. Hsu used CDR Replay to review a scan for a 2014 Toyota Corolla Quest and confirmed the data accuracy with the Bosch CDR Report. (**Ex. 71**, p.7.)

2.(s)   On March 26, 2020, B. Hsu used CDR Replay to review scans for a 2017 Mazda 3, a 2009 Pontiac G6, and a 2001 Lincoln LS. Each differed from the corresponding Bosch CDR Report and in some cases, made changes to the source or processing code. (**Ex. 71**, p.8.)

2.(t)   On March 27, 2020, B. Hsu used CDR Replay to review a scan for a 2013 Volvo S80, encountering a CDR crash similar to a previous Volvo scan in January. Hsu tried CDR900 and got the same error. He compared the data from the scan with the data from a scan for "another Volvo," made some changes to the "replay file," and was able to get the CDR to work. He speculated that this was a BUSMASTER error. **Ex. 71**, p.9.)

2.(u)  On March 31, 2020, B. Hsu used CDR Replay to check the scan for a 2018 Volkswagen Tiguan, and modified the logic in the CSI program based on the results. He also used CDR Replay to check the scan for a 2005 Toyota Tacoma and released the report after making a change in the resolution of the database. (**Ex. 71**, p.10.)

2.(v)  On April 1, 2020, B. Hsu received a scan request for a 2001 Toyota Camry where the scan failed, indicating unknown part number that was not on the Bosch list. He used a fake replay file with the part number, but the Bosch CDR Tool Software rejected it as unsupported. He also used CDR Replay to check the scans for a 2004 Ford Excursion and a 2008 Toyota Tacoma, making changes to the code to correct issues. (**Ex. 128**, p.2.)

2.(w)  On April 2, 2020, B. Hsu used CDR Replay to generate a Bosch report for a 2018 Ford Fiesta. B. Hsu also used CDR Replay to check a scan for a 2006 Cadillac CTS, feeding consecutive data points back to the CDR to troubleshoot an ignition cycle issue. Hsu noted that there was probably some bugs with the Bosch calculation and released those reports. (**Ex. 128**, p.2.)

2.(x)  On April 2, 2020, B. Hsu used CDR Replay to check a scan for a 2004 Chevrolet Silverado before releasing the report. (**Ex. 128**, p.3.)

2.(y)  On April 2, 2020, B. Hsu used CDR Replay to review a scan for a 2011 Dodge Grand Caravan, noting that Bosch indicated an interruption during recording. Hsu noted that CSI's report indicated a 17 km/hr rear-end collision, but that was not shown in the Bosch report at all. Hsu released the report with the delta-V included. (**Ex. 128**, p.3.)

2.(z)  On April 3, 2020, B. Hsu used CDR Replay to check a scan for a 2006 Saturn Ion, feeding fake values back to the CDR to obtain a more accurate resolution for the longitudinal delta-V. Hsu updated the resolution in CSI's Python code. (**Ex. 128**, p.4.)

2.(aa)  On April 14, 2020, B. Hsu used CDR Replay to check a scan for a 2020 Land Rover Range Rover Velar, which produced some data bytes, but some responses resulted in "7FFFFF." He added a fake cable in the database so that the Python code would try to process it but mark it as unsupported. (**Ex. 128**, p. 9

2.(bb)  On April 16, 2020, B. Hsu used CDR Replay to process and release a report for a 2007 Pontiac Grand Prix. (**Ex. 72**, p.2.)

2.(cc)  On April 14, 2020, B. Hsu used CDR Replay to check a scan on a 2012 Acura TL, indicating that the EDR does not support steering wheel angles and the Bosch CDR Report does not show them; However, the CSI "code does not know to skip processing." He "found the bytes that indicate the EDR version for Honda," and change the CSI code to skip processing for pre-crash steering for that version. He then released the report. (**Ex. 72**, p.2.)

2.(dd)  On April 21, 2020, B. Hsu used CDR Replay to check a scan for a 2017 RAM 2500, noting that the passenger seat belt was not configured, and added checks in the Python code for driver and passenger seat belt configuration. (**Ex. 72**, p.4.)

2.(ee)  On April 28, 2020, B. Hsu tried to run CDR Replay to generate a report for a 2020 Ford Explorer as requested by HUB. He noted that the Bosch CDR Tool Software wanted 6 new PIDs. He made up a response from other part numbers to get the scan to work. Then he replaced all responses with 0x00 and generated the final report. (**Ex. 72**, p.8.)

2.(ff)  On April 29, 2020, B. Hsu used CDR Replay to generate another Bosch report for the 2020 Ford Explorer, following a request from George White for the "raw data." . (**Ex. 72**, p.10.; *see also* **Ex. 121, 122**; **Ex. 127**.)

2.(gg)  On April 29, 2020, B. Hsu used CDR Replay to check a scan for a 2003 Buick Rendezvous having a cable module that had not previously been decoded. He decoded the scan and added the information to the Python code, but noted that delta-v cannot be determined because neither of the previous scans included delta-v tables. (**Ex. 72**, p.10.)

2.(hh)  On May 1, 2020, B. Hsu used CDR Replay on a scan for a 2014 Honda Odyssey and noted that the Bosch CDR report did not show pre-crash steering. Investigating further, he found that certain raw hex bytes were all 0s, and found a byte "close to the pre-crash data section that directly controls the pre-crash data," and speculated that it "is probably used to indicate whether a specific data set … is supported or valid." (**Ex. 73**, p.2.) On May 3, Hsu revisited the decoding for the Honda and found the bytes that control pre-crash steering, ABS and ESC. Then he added those in the processing code in Python. *Id.*, p. 3.

2.(ii)  On May 2, 2020, B. Hsu used CDR Replay to generate a report for a 2008 Scion tC, and then released the report. (**Ex. 73**, p.3)

2.(jj)  On May 5, 2020, B. Hsu used CDR Replay to review a scan for a 2005 Chevrolet Impala, identifying that the VPW replay did not work as the Bosch CDR Tool Software "rejected the response to PIO 0x2D." Hsu modified the raw JSON data.( **Ex. 73**, p.4.)

2.(kk)  On May 7, 2020, B. Hsu attempted to use CDR Replay on scan for a 2018 Ford Ranger, but found it could not be replayed. However, Hsu noted that the data interpreted by the Python code appeared to be acceptable. (**Ex. 73**, p.6.)

2.(ll)  On May 8, 2020, B. Hsu downloaded and installed version 19.4 of the Bosch CDR Tool Software, and added all the new vehicles, regions and cable numbers into the CSI software. He then attempted to use CDR Replay on a scan for a Subaru but the Bosch CDR Software requested a PID that the

CrashScan app did not ask for. Hsu then created a new JSON file for the "special Subaru process." (**Ex. 73**, p.7.)

2.(mm)On May 12, 2020, B. Hsu used CDR Replay to review the scan for a 2012 Dodge Grand Caravan that had decoding issues. Hsu corrected an error in the Python source code, then released the report. (**Ex. 73**, p.9.)

2.(nn) On May 15, B. Hsu used CDR Replay to review a scan for a 2015 Subaru Outback, noticing an error on the report. He subsequently corrected it in the processing code and released the report. (**Ex. 73**, p. 12.)

2.(oo) On June 1, 2020, B. Hsu used CDR Replay to produce a Bosch CDR Report for a 2013 Nissan Juke scanned by Hub Enterprises, and sent the report per the request for the "raw data." (**Ex. 123**.)

2.(pp) CSI's internal system sends email alerts to B. Hsu when a user scans a particular vehicle, instructing him to use CDR Replay to check the data before releasing the report to the customer. (**Exs. 76, 77, 82, 85, 86, 87, 88, 92, 93, 101, 104, 156**) (**Hrg. Tr.** 190:17 – 195:6.)

2.(qq) CSI utilized its CDR Replay tool to produce and save Bosch CDR Reports on vehicles scanned by its customers, who subsequently paid for the CSI CrashScan Report. Examples include the following:

   **(i)**    2021 Volkswagen Atlas on 2/22/21 (**Ex. 113**) and 2021 Toyota RAV4 on 2/26/21 (**Ex. 114**); Management Report, List of Purchased Reports (**Ex. 84**).

   **(ii)**   2021 Chevy Spark on 4/5/21 (**Ex. 112**); Management Report, List of Purchased Reports (**Ex. 81**).

   **(iii)**  2021 Toyota Corolla on 6/2/21 (**Ex. 106**); Management Report, List of Purchased Reports (**Ex. 103**).

   **(iv)**   2021 Honda Passport on 7/26/21 (**Ex. 109**); Management Report, List of Purchased Reports (**Ex. 79**).

   **(v)**    2021 Toyota Tundra on 9/17/21 (**Ex. 108**); Management Report, List of Purchased Reports (**Ex. 120**).

   **(vi)**   2018 Honda Accord on 9/20/21 (**Ex. 115**); Management Report, List of Purchased Reports (**Ex. 90**).

   **(vii)**  2018 Honda Accord on 10/27/21 (**Ex. 116**); Management Report, List of Purchased Reports (**Ex. 95**).

3. **CSI's Characterization of its CrashScan Application and Platform During the term of the 2019 EULA.**

   3.(a) On February 20, 2020, J. Bayley sent an email to P. Mammen, Farmers Ins., describing CSI's products and services, comparing them to Bosch CDR reports, and stating "we are capable of generating the 'OEM' interpretation version of the report in our lab (i.e., Bosch CDR reports)." (**Ex. 179**.)

G. **The Audit of Collision Sciences' use of the Bosch CDR Tool Software.**

Bosch initially requested an audit of CSI use of the CDR Tool Software on July 14, 2020, citing the audit provision in the 2019 EULA. After prolonged negotiations and CSI's perceived lack of cooperation, Bosch filed its Demand for Arbitration on August 20, 2021. The parties attempted to resolve the audit question through mediation but failed to reach an agreement on the protocol. On April 20, 2022, following Bosch's Request for Interim Measures, the Arbitrator ordered the audit to proceed. At CSI's request, the audit was conducted by a third-party forensic investigator remotely over several months, with the final audit report issued on July 31, 2023.

The audit uncovered several key findings, including CSI's use of packet-sniffer software called BUSMASTER to intercept messages sent to and from the Bosch CDR Tool Software, the existence and operation of CSI's CDR Replay tool which incorporated elements of Bosch's software, and evidence suggesting CSI used Bosch's software to verify and improve its own competing product. The audit also revealed instances where CSI generated Bosch-branded reports using remotely collected data and rapidly adopted support for new vehicle models shortly after Bosch's updates. These findings violated multiple provisions of the 2019 EULA. The total cost of the audit paid by Bosch was $111,501.80, which Bosch is entitled to recover based on unauthorized use, as stipulated in the EULA.

## LEGAL STANDARD

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in [injury] to

the party claiming breach." *Miller-Davis Co. v. Ahrens Constr., Inc.,* 495 Mich. 161, 178, 848 N.W.2d 95 (2014). "Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court." *Van Buren Charter Twp. v. Visteon Corp.,* 904 N.W.2d 192, 202 (Mich. Ct. App. 2017) (*citing Meagher v. Wayne State Univ.,* 565 N.W.2d 401 (Mich. 1997)). Clear and unambiguous contractual language must be enforced as written. *Holland v. Trinity Health Care Corp.,* 791 N.W.2d 724 (Mich. 2010). Under Illinois law, the essential elements of a breach of contract claim are: "(1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) resultant injury to the plaintiff." *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC,* 2016 IL App (1st) 142754, ¶85, 59 N.E.3d 41, 64 (2016).

## ARGUMENT

**A.      CSI Breached both the 2017 EULA and the 2019 EULA.**

**1.      Both the 2017 EULA and the 2019 EULA are enforceable contracts.**

Since at least 2010, and during the entire term of each license subscription purchased by CSI, activation of the Bosch CDR Tool Software has required an activation certificate provided directly by Bosch. During the process of uploading the activation certificate into the software, the program displays a dialog box with the contents of the EULA, allowing the user to scroll through the entirety of the document. The user is then required to check the box next to the words "I accept," and click the "continue" button for the software to be activated and fully functional. Contracts such as this are considered "clickwrap" agreements, and are routinely found to be enforceable contracts. *See Traton News, LLC v. Traton Corp.,* 528 F. App'x 525, 526 n.1 (6th Cir. 2013) (clickwrap agreements "require the user to manifest assent to the terms by clicking on an icon"); *Shirley v. Rocket Mortg.,* No. 2:21-cv-13007, 2022 U.S. Dist. LEXIS 119855, at *4 (E.D. Mich. July 7, 2022) ("Courts have routinely found 'clickwrap' agreements

enforceable because by checking a box explicitly stating 'I agree' in order to proceed, the 'consumer has received notice of the terms being offered and, in the words of the Restatement, 'knows or has reason to know that the other party may infer from his conduct that he assents' to those terms.").

After each purchase of a license subscription for the Bosch CDR Tool Software, CSI activated the software and began using it within days. During each activation, CSI was presented with the terms of the applicable EULA and had to accept those terms in order to continue using the software. The fact that it did use the software is conclusive evidence that it agreed to both the 2017 EULA and the 2019 EULA, thereby establishing each EULA as an enforceable contract.

1. **CSI created a derivative work of the Bosch CDR Tool, in violation of both the 2017 EULA and the 2019 EULA.**

Under both the 2017 and the 2019 EULA, Bosch reserves the exclusive right to create a derivative work of the Bosch CDR Software. **Ex. 1,** ¶1.3; **2,** ¶2.3.5. CSI's CDR Replay tool constitutes a derivative work of Bosch's CDR Tool software and its underlying database, both of which are integral to Bosch's proprietary system for retrieving, decoding, and analyzing EDR information based on communication with vehicles involved in accidents. Central to the Bosch CDR Tool software's functionality is Bosch's comprehensive and proprietary database which stores Bosch's data structures, commands, and protocols for individual vehicles and models. CSI's CDR Replay tool, developed through reverse engineering of Bosch's CDR Tool Software and database, heavily relies on Bosch's proprietary data structures, protocols, and interpretation methods to replicate the functionality of Bosch's software. The CDR Replay tool's ability to produce reports that mirror those generated by Bosch's CDR Tool Software underscores that CDR Replay is derived from Bosch's original work, particularly given its dependence on the same underlying database that Bosch painstakingly developed and maintains. Much more, the

continuous use of Bosch's CDR Tool Software via the CDR Replay tool right up to the day before this hearing underscores the deep dependency of the CDR Replay on the Bosch's software. This consistent utilization for generating supplementary reports as a "secondary opinion" further demonstrates that the CDR Replay tool does not merely interface with Bosch's software but relies fundamentally on its frameworks and processes. The CDR Replay tool's transformation of Bosch's protected software and database components into a new, yet fundamentally reliant tool, meets the legal criteria for a derivative work, as it adapts and recasts Bosch's original expressions without achieving independent originality.

A derivative work is one that is based upon one or more preexisting works. *S&S Innovations Corp. v. UUSI, LLC*, No. 1:18-cv-1377, 2021 U.S. Dist. LEXIS 70, at *32 (W.D. Mich. Jan. 4, 2021). When a software program is built to run with an already existing software program, and especially when it cannot function without that underlying program, it is considered a derivative work. *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 747 (E.D. Mich. 1998) (finding that a software program that was created to work with and on top of an underlying software program, and that could not function without the underlying program, was a derivative work). However, courts do not require that a derivative work be a market substitute to be considered a derivative work, contrary to CSI's assertion. Instead, courts examine whether a derivative work serves as a market substitute when assessing whether it qualifies as permissible under the doctrine of fair use—not in determining whether the work is derivative in nature. The Supreme Court in *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 593 (1994) cited by CSI, addressed the issue of market substitution strictly in the context of fair use, not to define whether a work itself qualifies as derivative. Additionally, courts have found that where a work has been

prepared in different versions, each constitutes a separate work. *SimplexGrinnell, LP v. Integrated Sys. & Power, Inc*., 642 F. Supp. 2d 206, 212 (S.D.N.Y. 2009).

CSI has continuously used CDR Replay with new versions of the Bosch CDR Tool Software. Each new version of the Bosch CDR Tool Software is a preexisting work, and thus each use of CDR Replay with each version constitutes a separate derivative work. Specifically, CSI generated Bosch reports using CDR Replay and the Bosch CDR Tool Software versions 17.6.1, 17.7.1, and 17.7 in violation of the 2017 EULA. *See, e.g., supra* at Para. F.1; **Ex. 61** (v. 17.6.1); **Ex. 167** (v. 17.7.1); **Ex. 140** (v. 17.7); **Ex. 16** (v. 17.9). Additionally, CSI generated Bosch reports using CDR Replay and the Bosch CDR Tool Software versions 19.0, 19.1, 19.2, 19.3.1, 19.4, 19.4.2, in violation of the 2019 EULA *See*, *e.g.*, *supra* at Para. F.2; **Exs. 117, 126** (v. 19.0.0); **Exs. 151, 152** (v. 19.1.0); **Ex. 125** (v. 19.2.0); **Exs. 30, 31, 123** (v. 19.4.0); **Exs. 105-109, 112-116** (v. 19.4.2).

**2.     CSI's CDR Replay Allows for the remote operation of Bosch's CDR Tool Software.**

The 2019 EULA expressly prohibits the use of remote operation of Bosch's CDR Tool Software. **Ex. 2**, ¶¶ 2.2.1, 2.3.3**.** CSI used the Bosch CDR Tool Software via remote and wireless transmission in clear violation of the 2019 EULA's terms. CSI's CrashScan application wirelessly connects to vehicles to extract crash data and then transmits that data remotely to CSI's servers. Once on the servers, this data can be, and is frequently processed using CSI's CDR Replay tool, which relies on and incorporates the Bosch CDR Tool Software. This setup allows CSI use Bosch CDR Tool Software to produce Bosch-branded CDR reports without a direct physical connection to the vehicle, as required by the Bosch EULA. CSI has touted its ability to produce the Bosch-branded CDR reports using data retrieved wirelessly through the CrashScan mobile application. It is not uncommon for a customer of CSI to request a Bosch-

branded CDR report for a vehicle scanned using CSI's application, and for CSI to provide a Bosch-branded report. CSI also makes extensive use of the Bosch-branded reports to verify the results produced by its CrashScan application and make modifications to the application. CSI has even established internal requirements that certain crash reports must be manually checked using its CDR Replay tool because of perceived unreliability.

CSI's remote and wireless use of the Bosch CDR Tool Software directly contravenes the EULA, which explicitly prohibits "indirectly connecting the CDR tool through a wireless OBDII communications device, enabling remote connection to CDR tools over a server or internet server." By implementing this wireless and server-based system, CSI has used the Bosch CDR Tool Software in a manner expressly forbidden by the terms of the license agreement.

### 3. CSI used the CDR Tool Software to compete with Bosch's products or services

The 2019 EULA expressly prohibits the use of the CDR Tool Software "in any way that competes with Bosch's products or services." **Ex. 2**, ¶¶2.3.7, 2.4. Since at least 2017, CSI's CEO Jason Bayley has been actively marketing CSI's software product as a direct competitor to, and a replacement for, Bosch's CDR Tool Software with claims that it is significantly lower in cost, is simpler to use, and easier to understand the reports. (**Hrg. Tx**. 244:8-245:24.) On numerous occasions, CSI sent to potential customers both its own crash report and a Bosch-branded CDR report produced using the same data obtained through the CrashScan application, and invited the potential customer to compare the reports. (*See, supra* at Para. E.) Furthermore, CSI used the Bosch-branded report as a verification that the CSI crash report contained accurate data and analysis before releasing and charging those customers for the CSI product. *See, supra*, Para. F.2.(qq). CSI even sent Bosch CDR Reports to customers or potential customers as further verification of its own product. (*See, e.g.,* **Exs. 121, 122, 126, 127, 151**.)

Whether or not a Bosch CDR Report is exactly the same as a CSI report is not the issue. Instead, it is whether CSI's use of the Bosch CDR Tool Software competes with Bosch's products or services. Under the simplest analysis, this question must be answered affirmatively. Throughout 2019-2022, CSI repeatedly used the Bosch CDR Tool Software to create at least almost 2500 Bosch CDR Reports, using them to verify its own product's accuracy and to produce Bosch-branded reports for potential customers. (**Exs**. **70, 71, 72, 73, 79, 103, 106, 108, 109, 112, 113, 120, 124, 126, 128, 151**; **Hrg. Tx.** 208:15-18, 219:4-10.) CSI's marketing efforts positioned its product as a cost-effective alternative to Bosch's CDR tool, explicitly claiming it could eliminate the need for Bosch's hardware and software. (**Ex. 140**; **Hrg. Tr.** 244:12-245:24.) This use of the Bosch software, in unquestionably direct competition with Bosch, coupled with the alleged unauthorized use of Bosch's technology, is expressly contrary to the terms of the 2019 EULA, and constitutes a breach by CSI.

### 4. CSI Reversed Engineered Bosch's CDR Tool Software to make its CDR Replay tool and to create its database.

The 2019 EULA expressly prohibits reverse engineering of the Bosch CDR Tool Software. **Ex. 2**, ¶¶2.3.1, 8.1. Reverse engineering is defined as a "process of discovering how an invention works by inspecting and studying it, esp. by taking it apart in order to learn how it works and how to copy it and improve it." *Reverse-engineering*, Black's Law Dictionary (11th ed. 2019). The United States Supreme Court has defined reverse engineering as the process of "starting with the known product and working backward to divine the process which aided in its development or manufacture." *Kewanee v. Bicron*, 416 U.S. 470, 476 (1974); *see also Fleet Eng'rs v. Tarun Surti & Mudguard Techs.*, No. 1:12-cv-1143, 2017 U.S. Dist. LEXIS 229222, at *12 (W.D. Mich. June 8, 2017). Brian Hsu, CSI's Chief Technology Officer, has a similar understanding of the meaning of reverse engineering, as "figuring out how something works."

(**Hrg. Tr.** 183:25 – 184:3.) Additionally, the 2019 EULA expressly prohibits decompiling and decoding of the Bosch CDR Tool Software. **Ex. 2**, ¶¶2.3.1, 8.1. Thus, in order to avoid redundancy and give all terms in the contract meaning, reverse engineering must mean something more than decoding or decompiling.

A contractual term is ambiguous on its face only if it is equally susceptible to more than a single meaning. *Kendzierski v. Macomb Cnty*., 503 Mich. 296, 311-12, (2019). However, "ambiguity is a finding of last resort" which is "to be reached only after all other conventional means of interpretation have been applied and found wanting." *Id*. It is the courts "duty in interpreting … a contract… to give effect to the intent of the drafter." *Batton-Jajuga v. Farm Bureau Gen. Ins. Co*., 322 Mich. App. 422, 429, 913 N.W.2d 351, 354 (2017). Only when ambiguity exists does the Court turn to common canons of construction for aid in construing a text's meaning. *Id*. In the absence of a statutory or contractual definition, the Court "may turn to dictionaries in common usage for guidance." *Id.* That is, where a term is not defined, it is accorded its commonly understood meaning and the Court may customarily determine what a typical layperson would understand a particular term to mean by turning to dictionary definitions. *Drouillard v. Am. Alt. Ins. Corp*., 504 Mich. 919, 919 (2019). Courts have found the term "reverse engineering" to be unambiguous, favoring a broader interpretation that encompasses analyzing software to replicate its functionality, based on clear dictionary definitions, even without a specific contractual definition. *SAS Inst., Inc. v. World Programming Ltd*., 874 F.3d 370, 382 (4th Cir. 2017) (the court found the term "reverse engineering" unambiguous by applying traditional tools of contract interpretation, including examining dictionary definitions for plain meaning, considering the term's context within the entire agreement to avoid redundancy when considered alongside "reverse assembling" and

"decompiling," which would have contradicted the court's contract interpretation rule to give effect to all contract terms, and concluding that extrinsic evidence was unnecessary because the term was not equally susceptible to multiple meanings based on its ordinary usage and none of the evidence provided undermined the court's interpretation).

CSI unambiguously reversed engineered the Bosch CDR Tool Software to develop and update their products. CSI's development of the CrashScan application and CDR Replay tool replicate key functionalities of Bosch's proprietary software, particularly in interpreting crash data from vehicle ECUs. CSI's CDR Replay tool system is the use of BUSMASTER software, which acts as a packet-sniffer to intercept, interpret, and display messages sent to and from the Bosch CDR Tool Software. This setup allows CSI to observe and analyze the data exchange between Bosch's software and vehicle modules, which in turn enables CSI to replicate the Bosch CDR Tool Software's communication protocols and data structures. By monitoring the data flow between the Bosch CDR Tool Software and the simulated vehicle EDR of CDR Replay, CSI gained insights into how Bosch's CDR Tool Software communicates with the multitude of vehicle engine control units installed in thousands of different makes and models.

Furthermore, CSI's ability to rapidly add support for new vehicle models and ECUs in CrashScan is dependent on CSI's ongoing reverse engineering of Bosch's software. That is, CrashScan's functionality depends entirely on its ability to mimic the observable operations of the Bosch's CDR Tool Software and database, which it has reverse-engineered. This means that CrashScan cannot analyze any new vehicles that require a new update to the CDR Tool Software and database without first reverse engineering those updates.

From the outset, CSI looked to Bosch's CDR Tool Software and database for developing their own products, including through the use of "reverse engineering" (**Ex.** 42, 43, 135, **Hrg.**

**Tr.** 223:8-226:4.) CSI continued this strategy by designing and implementing a system that relies on CDR Replay to reverse engineer and duplicate the functions of Bosch's software so that they could update and correct their own software and database. CSI went as far as setting up an email alert system that requires CDR Replay be used to correct and update their own software, as they were unable to fully reverse engineer all aspects of Bosch CDR Tool software, particularly its updates. For example, Mr. Hsu admitted that as late as May 2020 he ran CDR Replay on a 2012 Dodge Grand Caravan based on a decoding issue and subsequently updated their Python source code to fix a coding error, which they were only able to find by running CDR Replay with Bosch CDR Tool software and generating a Bosch CDR report. (**Ex. 73**, p. 9; **Hrg. Tr.** 206:16 – 207:12.) This strategy has continued even up to the day before this hearing, as Mr. Hsu admitted to using CDR Replay as late as September 6, 2024. (**Hrg. Tr.** 207:13-15.)

**B.**  **The Software Audit demonstrated unauthorized use of the Bosch CDR Tool Software by CS.**

The 2019 EULA required CSI's cooperation with an audit of CSI's use of the Bosch CDR Tool Software. **Ex. 1**, ¶10. The audit revealed that CSI engaged in unauthorized use of the Bosch CDR Tool Software, violating the terms of the EULA. (**Ex. 39**, ¶¶ 54-63.) A key finding was CSI's use of packet-sniffer software called BUSMASTER, which was used to intercept, interpret, and display messages sent to and from the Bosch CDR Tool Software. (**Ex. 39**, ¶ 54; **Hrg. Tr.** 124:20-125:6.) This unauthorized monitoring allowed CSI to gain insights into the internal workings of Bosch's proprietary software so that CSI could duplicate its functions. (**Ex. 39**, ¶13.2, 57-63.7; **Hrg. Tr.** 124:20-127:15; 159:6-160:22.) The audit also uncovered CSI's CDR Replay tool, which relied on and incorporated elements of the Bosch CDR Tool Software without permission. (**Ex. 39**, ¶ 54; **Hrg. Tr.** 129:7-13.) Furthermore, evidence suggested that CSI used the Bosch software to verify and improve its own competing product, CrashScan, by

comparing outputs and making adjustments based on the Bosch software's performance. (**Ex. 39**, ¶ 60. **Hrg. Tr.** 159:6-160:22) The audit further revealed instances where CSI generated Bosch-branded reports using remotely collected data, a clear violation of the EULA's restrictions on remote and wireless use. (**Ex. 39**, ¶ 56, 59; **Hrg. Tr.** 155:10-15.) Additionally, CSI's rapid adoption of support for new vehicle models shortly after Bosch's updates, for example, one day after the release of CDR version 19.4, pointed to ongoing unauthorized use and potential reverse engineering of the Bosch software. (**Ex. 38**, ¶¶ 51.18, 51.19). CSI's creation of derivative works based on CDR Tool Software and database is also a violation of both EULAs. (**Ex. 39**, ¶¶ 54, 65; **Hrg. Tr.** 149:23-150:24.) These findings collectively demonstrated a pattern of unauthorized use that extended far beyond the scope of the EULAs.

As the audit process uncovered multiple instances of CSI's unauthorized use of the Bosch CDR Tool Software, Bosch is entitled an award of the costs of the audit.

## REQUESTED RELIEF

### A.     A permanent injunction is warranted in these circumstances.

The parties agreed that CSI's specific breaches of the 2019 EULA constitute irreparable harm and warrants a permanent injunction. Pursuant to paragraph 8.1 of the 2019 EULA, CSI acknowledged that any efforts to reverse engineer the Bosch CDR Tool Software, "*or any other efforts to learn the contents of such source code, data bases or resource files and applications,*" could result in access to or knowledge of Bosch's trade secrets without permission, and that such access could cause Bosch irreparable injury, entitling Bosch to obtain a permanent injunction. **Ex. 2**, ¶8.1. This contractual provision supports a finding of irreparable harm. *York Risk Servs. Grp., Inc. v. Couture,* 787 F. App'x 301, 308 (6th Cir. 2019); *J.P. Morgan Sec., LLC v. Duncan,* No. 2:22-cv-11732, 2022 U.S. Dist. LEXIS 143924, at *15 (E.D. Mich. Aug. 11, 2022).

A plaintiff seeking a permanent injunction must demonstrate that: "(1) it has suffered irreparable injury; (2) remedies at law are not adequate to compensate for that injury; (3) the balance of hardship between the plaintiff and defendant weighs in favor of a permanent injunction; and (4) it is in the public interest to issue an injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

Irreparable injury is defined as "an injury that cannot be adequately measured or compensated by money." *Cellnet Comm'ns, Inc. v. New Par*, 291 F. Supp. 2d 565, 569 (E.D. Mich. 2003) (citations omitted). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992). Courts have found irreparable harm when there is no cure for a breach of an agreement. *ITT Educ. Servs. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008). This includes finding irreparable injury can be inferred from a breach of contract based on the risk of good will of a business. *Ormco Corp. v. Johns*, 869 So. 2d 1109, 1118 (Ala. 2003). The loss of customer goodwill and competitive position may constitute irreparable harm. *FirstEnergy Solutions Corp. v. Flerick*, 521 Fed. Appx. 521, 529 (6th Cir. 2013). Bosch has suffered irreparable injury due to CSI's unauthorized use and reverse engineering of its proprietary CDR Tool Software, and CSI's unauthorized creation of multiple derivative works. The use of packet-sniffer software like BUSMASTER to intercept and analyze Bosch's software communications represents a significant threat to Bosch's competitive advantage that cannot be adequately measured or compensated by money alone. Second, monetary damages are inadequate to fully compensate for this injury, as the potential ongoing and future misuse of Bosch's proprietary information could lead to long-term market erosion and loss of technological edge. Third, the

balance of hardships favors Bosch, as CSI's unauthorized activities threaten Bosch's substantial investment in its software, while CSI would only be required to cease unlawful behavior.

Finally, the public interest is served by protecting the public from CSI's unreliable EDR retrieval tools, protecting intellectual property rights, and enforcing contractual obligations, which promotes the development and reliance of reliable EDR retrieval tools and promotes innovation and fair competition in the marketplace. As shown above, CSI has continually patched or used band-aid solutions to correct issues in their tools by manually editing their python code, reports, and process or simply ignoring such issues. As such, their tools are simply unreliable. Furthermore, given the nature of software and database and the ease with which it can be replicated and distributed, allowing CSI's conduct to continue unchecked poses a significant risk of further irreparable harm to Bosch.

Therefore, Bosch is entitled to a permanent injunction against CSI. First, CSI should be prohibited from any further use of the Bosch CDR Tool Software, terminating the 2017 EULA for cause, and finding that the 2019 EULA automatically terminated upon CSI's breach of its terms. Further, CSI should be enjoined from using the data and other information obtained or derived from its unauthorized use of the Bosch CDR Tool Software, and be ordered to expunge such material from its software and databases. Such an injunction is not only appropriate but necessary to prevent ongoing and future violations of Bosch's rights under the EULA, to protect its valuable intellectual property, and to protect the public from an unreliable product.

The evidence that CSI used the Bosch CDR Tool Software in an unauthorized, and strictly prohibited manner is not credibly in dispute. CSI purchased subscription licenses to the Bosch CDR Tool Software *solely* for the purpose of creating and supporting its own CrashScan application, thus inappropriately usurping Bosch's substantial investments for its own monetary

gain. The function, operation, and legitimacy of CSI's CrashScan application is so dependent upon the Bosch CDR Tool Software that CSI continued to use the Bosch software throughout the duration of this Arbitration, up to the business day prior to the start of this hearing.

**B.      Bosch is entitled to at least nominal money damages**

The United States Supreme Court has ruled that nominal damages are damages awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 290 (2021). Similarly, Michigan courts have ruled that nominal damages can be awarded when a breach is established but does not result in quantifiable harm or when the harm cannot be proven with reasonable certainty. *Kolton v. Nassar*, 358 Mich. 154, 158, 99 N.W.2d 362, 364 (1959); *Hoover Invs., Inc. v. City of Charlotte*, No. 1:04-CV-689, 2006 U.S. Dist. LEXIS 20776, at *8 (W.D. Mich. Apr. 18, 2006) (finding nominal damages based solely on the breach of contract); *Viking Grp, Inc. v. Bruckman*, No. 347778, 2020 Mich. App. LEXIS 3237, at *8 (Ct. App. May 7, 2020) (holding that nominal damages are recoverable upon proof of a breach of contract.). Thus, even if a direct harm cannot be established, which it has been established multiple times above, Bosch is still entitled to nominal damages based on CSI's many breaches of the EULA.

**C.      Bosch is entitled to reimbursement for the costs of the Audit**

The Audit conducted pursuant to the 2019 EULA unquestionably uncovered CSI's unauthorized use of the Bosch CDR Tool Software. Pursuant to Section 10 of the 2019 EULA, Bosch is entitled to be reimbursed for the reasonable costs of the audit if the audit discovers "unauthorized use, reproduction, distribution, or other exploitation of the Software." (**Ex. 2**.) Accordingly, Bosch is entitled to an order requiring CSI to reimburse Bosch for the reasonable costs of the audit.

Attached to the Audit Report of Joshua HelfinSiegel (**Ex. 39**) are the invoices of DisputeSoft, through July 31, 2023, the date of Mr. HelfinSiegel's audit report. A summary of the invoices appears at the end, showing that DisputeSoft billed $111,501.80 through the conclusion of the audit process. The time and expense of the audit is reasonable, especially because the process was made more difficult because Mr. HelfinSiegel was not given access to a forensic image of the subject laptop. Instead, he was required to remotely connect to the laptop and conduct searching on a live device. (*See* $111,501.80 from CSI for reimbursement of the costs of the audit.

**D.    Requested Award from Arbitrator**

Bosch specifically requests that the Arbitrator make an Award in Bosch's favor according to the following terms:

A.    A finding that Claimant Bosch Automotive Service Solutions Inc. ("Bosch") has proven its claims for breach of contract for both the End User License Agreement ("EULA") dated January 22, 2017 ("the 2017 EULA"), and the EULA dated May 31, 2019 ("the 2019 EULA") against Respondent Collision Sciences Inc. ("CSI").

B.    A finding that Bosch has proven that CSI's breach has and is causing irreparable harm, and that Bosch is entitled to a permanent injunction against CSI as follows:

(i)    Permanently enjoining CSI, and its employees, owners, officers, contractors, and agents, from using or possessing any version of the Bosch CDR Tool Software, including any version licensed to third-parties;

(ii)    Requiring CSI, within ten (10) days of the Award, to take all necessary steps to uninstall, remove and delete any copy of the Bosch CDR Tool Software in its possession, as well as any install files and activation certificates for same; and

(iii)    Requiring CSI, within thirty (30) days of this Award, to cease use, operation of, and offering services through, its current CrashScan application, its CDR Replay tool, and its supporting databases, as well as any iteration, version or modification thereof created on or after January 26, 2018 (the date CSI agreed to the 2017 EULA).

C.    A requirement that CSI provide to Bosch a certification executed under oath that it has taken the steps ordered in sub-paragraphs B(ii) and B(iii) above.

D.    A finding that Bosch has proven that an audit of CSI's usage of the Bosch CDR Tool Software uncovered unauthorized use by CSI and that, under the 2019 EULA, Bosch is entitled to reimbursement of the reasonable costs of the audit, finding such costs to be in the amount of $111,501.80.

E.    Awarding Bosch nominal damages as a result of CSI's breach of the EULAs in the sum of $500.00.

In the event that the Arbitrator does not find that the relief specifically requested in under B(iii) above is warranted or appropriate, Bosch proposes, as an alternative remedy, that CSI be required to permanently expunge from its database all data records relating to crash data having a creation date on or after January 26, 2018 (the date CSI purchased a license covered by the 2017 EULA), or, if a breach of the 2017 EULA is not proven, having a creation date on or after July 9, 2019 (the date CSI purchased a license covered by the 2019 EULA). As discussed, *supra*, CSI's database records include a creation date, allowing for this remedy to be implemented with relative ease.

## <u>CONCLUSION</u>

The evidence that CSI used the Bosch CDR Tool Software in an unauthorized, and strictly prohibited manner is not credibly in dispute. CSI purchased subscription licenses to the Bosch CDR Tool Software **solely** for the purpose of creating and supporting its own CrashScan application, thus inappropriately usurping Bosch's substantial investments for its own monetary gain. The function, operation, and legitimacy of CSI's CrashScan application is so dependent upon the Bosch CDR Tool Software that CSI continued to use the Bosch software throughout the duration of this Arbitration, up to the business day prior to the start of this hearing.

Based on the foregoing, Claimant respectfully requests that, after receiving evidence and presentations of the parties at the final hearing, and considering post-hearing briefs, the Arbitrator enter an Award in favor of Claimant and against Respondent, in the form as described

above and as set forth in the accompanying Proposed Final Arbitration Award, and provide

Claimant with such other and further relief to which Claimant may be justly entitled.

Dated: November 8, 2024                         Respectfully submitted,

/s *Steven McMahon Zeller*
_____

Steven McMahon Zeller
Diego F. Freire
Dykema Gossett PLLC
10 S. Wacker Drive, Suite 2300
Chicago, Illinois 60606
Telephone:  (312) 876-1700
Fax:  (312) 876-1155
SZeller@dykema.com
DFreire@dykema.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via e-mail on November 8, 2024, to the Arbitrator, counsel for Respondent, Collision Sciences, Inc., and the case administrator, as indicated below, with a copy sent by U.S. Mail.

Dykema Gossett PLLC

By:____ /s *Steven McMahon Zeller*_____

Steven McMahon Zeller
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 627-2272
szeller@dykema.com
COUNSEL FOR CLAIMANT

**SERVICE LIST**

Thomas W. Cranmer
Arbitrator
Miller Canfield
840 W. Long Lake Road, Suite 150
Troy, Michigan 48098
cranmer@MillerCanfield.com

ARBITRATOR

Timothy P. Monsma
Varnum LLP
333 Bridge Street NW, Suite 1700
Grand Rapids, Michigan 49504
tpmonsma@varnumlaw.com

COUNSEL FOR RESPONDENT

Rafael Carlos del Rosal Carmona
Director
American Arbitration Association
120 Broadway, 21st Floor,
New York, NY 10271
RafaelCarmona@adr.org

CASE ADMINISTRATOR

4889-0711-5504.17